(Slip Opinion)

# Ratification of the Equal Rights Amendment

Congress has constitutional authority to impose a deadline for ratifying a proposed constitutional amendment. It exercised this authority when proposing the Equal Rights Amendment and, because three-fourths of the state legislatures did not ratify before the deadline that Congress imposed, the Equal Rights Amendment has failed of adoption and is no longer pending before the States. Accordingly, even if one or more state legislatures were to ratify the proposed amendment, it would not become part of the Constitution, and the Archivist could not certify its adoption under 1 U.S.C. § 106b.

Congress may not revive a proposed amendment after a deadline for its ratification has expired. Should Congress wish to propose the amendment anew, it may do so through the same procedures required to propose an amendment in the first instance, consistent with Article V of the Constitution.

January 6, 2020

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

You have asked for our views concerning the legal status of the Equal Rights Amendment ("ERA"). Consistent with Article V of the Constitution, two-thirds of both Houses passed a joint resolution proposing the ERA, which would become part of the Constitution when ratified by three-fourths of the States. *See* 86 Stat. 1523 (1972) ("ERA Resolution"). Consistent with the last seven amendments adopted before 1972, Congress conditioned ratification on a deadline, requiring that the necessary number of States (thirty-eight) approve the amendment within seven years. *See id*. As that deadline approached, only thirty-five States had ratified the ERA, and several had sought to rescind their initial approvals. Congress took the unprecedented step of voting, with a simple majority in each House, to extend the deadline by three years, until June 30, 1982. *See* 92 Stat. 3799 (1978). That new deadline came and went, however, without additional ratifications. The ERA thus failed to secure the necessary ratifications within either of Congress's deadlines.

Nearly four decades later, ERA supporters have renewed their push to ratify the amendment. Some have urged Congress to restart the ratification process by proposing it anew. *See, e.g.*, Remarks of Justice Ruth Bader Ginsburg, Georgetown University Law Center (Sept. 12, 2019) ("[T]he ERA fell three States short of ratification. I hope someday it will be put back in the political hopper, starting over again, collecting the

necessary number of States to ratify it.").[1] Others, however, have urged the outstanding States to ratify the long-expired ERA Resolution, arguing that the congressional deadline was invalid or could be retroactively nullified by Congress. In 2017, Nevada voted to ratify the ERA, *see* S.J. Res. 2, 79th Leg. (Nev. 2017), and in 2018, Illinois did the same, *see* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018). If the ratification period remains open, and if the efforts by five States to rescind their earlier ratifications are disregarded, then thirty-seven States could be credited with having voted to ratify the ERA. After falling just short of ratifying the ERA during its 2019 session, the Virginia legislature is expected to vote again early this year.

Congress has charged the Archivist of the United States with the responsibility to publish a new constitutional amendment upon receiving the formal instruments of ratification from the necessary number of States. Whenever the National Archives and Records Administration ("NARA") receives "official notice" that an amendment to the Constitution "has been adopted," the Archivist "shall forthwith cause the amendment to be published" along with a certificate identifying the States that ratified the amendment and declaring "that the [amendment] has become valid, to all intents and purposes, as a part of the Constitution of the United States." 1 U.S.C. § 106b. In view of this responsibility, NARA has received inquiries from Members of Congress and from several States asking about the status of the ERA. Accordingly, you have asked for our views on the legal status of the proposed amendment.[2]

We conclude that Congress had the constitutional authority to impose a deadline on the ratification of the ERA and, because that deadline has expired, the ERA Resolution is no longer pending before the States. The Supreme Court has upheld Congress's authority to impose a deadline for ratifying a proposed constitutional amendment. *See Dillon v. Gloss*, 256 U.S. 368, 375–76 (1921) ("Of the power of Congress, keeping within

---

[1] https://www.facebook.com/georgetownlaw/videos/justice-ginsburg-to-address-new-georgetown-law-students/2325195750861807 (remarks starting at 1:03:35); *see also* Marcia Coyle, *Partisan Divisions Are 'Not Serving Our Country Well,' Justice Ginsburg Says*, Nat'l L.J., Sept. 12, 2019 (quoting Justice Ginsburg's remarks on the ERA), https://www.law.com/nationallawjournal/2019/09/12/partisan-divisions-are-not-serving-our-country-well-justice-ginsburg-says/.

[2] *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Gary M. Stern, General Counsel, National Archives and Records Administration (Dec. 12, 2018).

reasonable limits, to fix a definite period for the ratification we entertain no doubt."). Although Congress fixed the ratification deadline in the proposing clause of the ERA Resolution, rather than in the proposed amendment's text, that choice followed established practice. After incorporating ratification deadlines in the text of four amendments, *see* U.S. Const. amends. XVIII, XX–XXII, Congress placed deadlines in the resolutions proposing each of the next four amendments. Both Houses of Congress, by the requisite two-thirds majorities, adopted the terms of the ERA Resolution, including the ratification deadline, and the state legislatures were well aware of that deadline when they considered the resolution. We therefore do not believe that the location of the deadline alters its effectiveness.

The more difficult question concerns whether Congress, having initially specified that state legislatures must ratify the proposed amendment within seven years, may modify that deadline. In 1977, this Office advised that Congress could extend the ERA's deadline before it had expired. *See* Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Extending the Time Period for Ratification of the Proposed Equal Rights Amendment* (Oct. 31, 1977) ("*Constitutionality of ERA Extension*").[3] We recognized that "respectable arguments can be made on both sides of this question," *id.* at 7, but we viewed Congress's authority to fix the deadline in the first instance as including a power to modify it even after the States had begun to vote on ratification, *see id.* at 20–21. We acknowledged, however, that there would be a "strong argument" that Congress's authority to extend a pending deadline would not include "reviving a proposed amendment" after the deadline had expired. *Id.* at 5–6.

Although we disagree with the 1977 opinion's conclusion that Congress may extend a ratification deadline on an amendment pending before the States, we agree in any event that Congress may not revive a proposed amendment after the deadline has expired. The Constitution authorizes Congress to propose amendments for ratification, but it does not contem-

---

[3] The 1977 opinion is not published in the *Opinions of the Office of Legal Counsel*, but it was reprinted in connection with Assistant Attorney General Harmon's November 1, 1977 congressional testimony. *See Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. 7–27 (1978).

plate any continuing role for Congress during the ratification period. *See* U.S. Const. art. V. Even if Congress could validly extend the ERA's ratification deadline before its expiration, that deadline expired decades ago. Should the people of the United States wish to adopt the ERA as part of the Constitution, then the appropriate path is for Congress (or a convention sought by the state legislatures) to propose that amendment once more, in a manner consistent with Article V of the Constitution.

## I.

Congress proposed the ERA to the States after five decades of deliberation over whether such an amendment was necessary to secure equal rights for women or might instead cut back on existing protections. The first ERA proposal was introduced in 1923. It would have provided that "[m]en and women shall have equal rights throughout the United States and every place subject to its jurisdiction" and that Congress could "enforce this article by appropriate legislation." S.J. Res. 21, 68th Cong. (1923); *see also* H.R.J. Res. 75, 68th Cong. (1923). The measure faced opposition from traditionalists and some leaders of the women's movement, including many who feared that the amendment would invalidate labor laws that protected women. *See* Mary Frances Berry, *Why ERA Failed: Politics, Women's Rights, and the Amending Process of the Constitution* 56–60 (1986). The proposal did not advance in 1923, but it was re-introduced repeatedly over the next fifty years, and it was the subject of multiple committee hearings.[4] The amendment appears to have first reached the Senate floor in July 1946, where it fell short of the required two-thirds majority by a vote of 38 to 35. *See* 92 Cong. Rec. 9404–05 (1946). The Senate would go on to approve the proposal by the required supermajority on two occasions, in 1950 and 1953. *See* 99 Cong. Rec. 8974 (1953); 96 Cong. Rec. 872–73 (1950). On both occasions, however, the House did not act on the measure.

---

[4] *See, e.g.*, H.R.J. Res. 42, 79th Cong. (1945); S.J. Res. 8, 77th Cong. (1941); S.J. Res. 65, 75th Cong. (1937); H.R.J. Res. 1, 75th Cong. (1937); S.J. Res. 1, 73d Cong. (1933); H.R.J. Res. 55, 71st Cong. (1929); S.J. Res. 64, 70th Cong. (1928); S.J. Res. 11, 69th Cong. (1925); *Equal Rights for Men and Women: Hearings on S.J. Res. 65 Before a Subcomm. of the S. Comm. on the Judiciary*, 75th Cong. (1938); *Equal Rights Amendment: Hearing on S.J. Res. 64 Before a Subcomm. of the S. Comm. on the Judiciary*, 70th Cong. (1929).

After languishing for decades, the ERA gained momentum during the 91st Congress. *See* H.R.J. Res. 264, 91st Cong. (1969). In 1970, Representative Martha Griffiths obtained the necessary signatures for a discharge petition to move the resolution out of the House Judiciary Committee, and the House approved the resolution by an overwhelming margin. *See* 116 Cong. Rec. 28004, 28036–37 (1970). The Senate, however, did not take a final vote on the resolution. *See* S. Rep. No. 92-689, at 4–5 (1972). Notably, in the debates over the ERA, opponents had seized on the absence of a ratification deadline. *See, e.g.*, 116 Cong. Rec. 28012 (1970) (remarks of Rep. Celler); *see also* 116 Cong. Rec. 36302 (1970) (remarks of Sen. Ervin) (proposing to amend the earlier resolution to include a seven-year deadline for ratification).

In the 92nd Congress, the resolution finally met with bicameral success. The House adopted the ERA Resolution by the requisite two-thirds majority on October 12, 1971. 117 Cong. Rec. 35815 (1971). The Senate did the same on March 22, 1972. 118 Cong. Rec. 9598 (1972).

The ERA Resolution reads in its entirety:

JOINT RESOLUTION

Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein)*, That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:

"ARTICLE —

"SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

"SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

"SEC. 3. This amendment shall take effect two years after the date of ratification."

86 Stat. at 1523.

The proposing clause of the ERA Resolution contains a ratification deadline, which required that "the legislatures of three-fourths of the several States" ratify the amendment "within seven years from the date of its submission by the Congress," resulting in a deadline of March 22, 1979. *Id*. In 1971, Representative Griffiths, the ERA's lead sponsor, defended the inclusion of the deadline, describing it as "customary," as intended to meet "one of the objections" previously raised against the resolution, and as a "perfectly proper" way to ensure that the resolution "should not be hanging over our head forever." 117 Cong. Rec. at 35814–15. The report of the Senate Judiciary Committee similarly explained: "This is the traditional form of a joint resolution proposing a constitutional amendment for ratification by the States. The seven year time limitation assures that ratification reflects the contemporaneous views of the people." S. Rep. No. 92-689, at 20; *see also* Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment: A Question of Time*, 57 Tex. L. Rev. 919, 921 (1979) (stating that ERA supporters "thought the stipulation innocuous, a 'customary' statute of limitations, not a matter of substance worth opposing" (footnote omitted)). Congress therefore made the deliberate choice to subject the proposed amendment to a seven-year ratification deadline.

After Congress adopted the ERA Resolution, the Acting Administrator of the General Services Administration transmitted certified copies of the full text of the resolution to the States with a request that each governor submit the proposed amendment "to the legislature of your state for such action as it may take." *Constitutionality of ERA Extension* at 3; *see, e.g.*, Letter for George C. Wallace, Governor, State of Alabama, from Rod Kreger, Acting Administrator, General Services Administration (Mar. 24, 1972).[5] Twenty-two States ratified the ERA by the end of 1972.[6] The

---

[5] As we have previously recognized, "Section 106b and its antecedents have long been understood as imposing a ministerial, 'record-keeping' duty upon the executive branch." *Congressional Pay Amendment*, 16 Op. O.L.C. 85, 98 (1992). From 1791 to 1951, the Secretary of State reported on the ratification of new amendments, a practice that Congress formally endorsed in 1818. *See* Act of Apr. 20, 1818, ch. 80, § 2, 3 Stat. 439. The Administrator of General Services held the duty from 1951 to 1984. *See* Pub. L. No. 82-248, ch. 655, sec. 2(b), § 106b, 65 Stat. 710, 710 (1951). In 1984, the role was transferred to the Archivist. *See* Pub. L. No. 98-497, § 107(d), 98 Stat. 2280, 2291 (1984).

[6] The States were Hawaii, New Hampshire, Delaware, Iowa, Idaho, Kansas, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, and

political winds shifted, however, and only thirteen more States ratified within the next five years.[7] During those years, four States voted to rescind their earlier ratifications.[8] A fifth State, South Dakota, later adopted a resolution providing that its prior ratification would be withdrawn if the requisite number of the States failed to ratify the ERA within the seven-year period. S.J. Res. 2, 54th Leg. (S.D. 1979).

As the seven-year deadline approached, Congress considered resolutions that would take the historically unprecedented step of extending the ratification deadline. *See* H.R.J. Res. 638, 95th Cong., 1st Sess. (1977); H.R.J. Res. 638, 95th Cong., 2d Sess. (1978). Congress had never before sought to adjust the terms or conditions of a constitutional amendment pending before the States. A subcommittee of the House Judiciary Committee conducted hearings over six days during which government offi-

---

California. S. Con. Res. 39, 6th Leg. (Haw. 1972); H.R. Con. Res. 1, 1972 Sess. Gen. Ct. (N.H. 1972); S. Con. Res. 47, 126th Gen. Assemb. (Del. 1972); S.J. Res. 1008, 64th Gen. Assemb. (Iowa 1972); S.J. Res. 133, 41st Leg. (Idaho 1972); H.R. Con. Res. 1155, 1972 Sess. Leg. (Kan. 1972); Legis. Res. 86, 82d Leg. (Neb. 1972); S. Con. Res. 1, 62d Leg. (Tex. 1972); H.R.J. Res. 371, 87th Gen. Assemb. (Tenn. 1972); H.R.J. Res. 125, 7th Leg. (Alaska 1972); S. Res. 3482, 1972 Jan. Sess. Gen. Assemb. (R.I. 1972); S. Con. Res. 74, 195th Leg. (N.J. 1972); H.R. Con. Res. 1017, 48th Gen. Assemb. (Colo. 1972); S.J. Res. 3, 60th Leg. (W. Va. 1972); Enrolled J. Res. 52, 1972 Spec. Sess. Gen. Assemb. (Wis. 1972); S. Con. Res. 9748, 179th Leg. (N.Y. 1972); S.J. Res. GG, 76th Leg. (Mich. 1972); H.R.J. Res. LLL, 76th Leg. (Mich. 1972); Res. 35, 1972 Sess. Gen. Assemb. (Md. 1972); Res. Ratifying the Proposed Amend. to the Const. of the U.S. Prohibiting Discrimination on Account of Sex, 167th Gen. Ct. (Mass. 1972); H.R.J. Res. 2, 1972 1st Extra. Sess. Gen. Assemb. (Ky. 1972); J. Res. 2, 1972 Sess. Gen. Assemb. (Pa. 1972); S.J. Res. 20, 1972 Sess. Leg. (Cal. 1972).

[7] Eight States ratified the ERA in 1973: Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, and Washington. H.R.J. Res. 2, 42d Leg. (Wyo. 1973); S.J. Res. 1, 48th Leg. (S.D. 1973); S.J. Res. 4, 57th Legis. Assemb. (Or. 1973); H.R. Res. 1, 68th Leg. (Minn. 1973); H.R.J. Res. 2, 31st Leg. (N.M. 1973); H.R.J. Res. 8, 1973 Sess. Gen. Assemb. (Vt. 1973); H.R.J. Res. 1, 1973 Jan. Sess. Gen. Assemb. (Conn. 1973); H.R.J. Res. 10, 43d Leg. (Wash. 1973). Three ratified in 1974: Maine, Montana, and Ohio. J. Res. to Ratify the Equal Rights Amend. to the Federal Const., 106th Leg., 1st Spec. Sess. (Me. 1974); H.R.J. Res. 4, 43d Leg. (Mont. 1974); H.R.J. Res. 11, 110th Gen. Assemb. (Ohio 1974). North Dakota ratified the ERA in 1975. S. Con. Res. 4007, 44th Legis. Assemb. (N.D. 1975). Indiana did so in 1977. H.R.J. Res. 2, 100th Gen. Assemb. (Ind. 1977).

[8] Kentucky voted to rescind its ratification in 1972. H.R.J. Res. 20, 1978 Sess. Gen. Assemb. (Ky. 1978). Nebraska did the same in 1973, Legis. Res. 9, 83d Leg. (Neb. 1973); Tennessee in 1974, S.J. Res. 29, 88th Gen. Assemb. (Tenn. 1974); and Idaho in 1977, H. Con. Res. 10, 44th Leg. (Idaho 1977).

cials, legal scholars, and political activists expressed differing views over whether Congress could validly extend the ratification deadline, whether it could adopt such a resolution by only a simple majority vote, and whether States could validly rescind their earlier ratifications. *See Equal Rights Amendment Extension: Hearings on H.J. Res. 638 Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 95th Cong. (1978) ("*House Extension Hearings*"). The witnesses included future Justice Ruth Bader Ginsburg, who was then a professor at Columbia Law School, and John Harmon, who was the Assistant Attorney General for this Office. A subcommittee of the Senate Judiciary Committee also conducted hearings. *See Equal Rights Amendment Extension: Hearings on S.J. Res. 134 Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 95th Cong. (1979) ("*Senate Extension Hearings*").

In connection with these hearings, Assistant Attorney General Harmon released an opinion, which he had provided to the Counsel to the President, concluding that the proposed extension of the ERA would likely be constitutional. *See Constitutionality of ERA Extension* at 1. The opinion advised that "respectable arguments can be made on both sides of this question," since Article V "can be viewed as envisioning a process whereby Congress proposes an amendment and is divested of any power once the amendment is submitted to the States for ratification." *Id.* at 7. Nevertheless, the opinion ultimately concluded that Congress's authority to "establish a 'reasonable' time in which ratification may occur," *id.*, may be subject to modification by a later Congress at least where the deadline has not yet expired, *see id.* at 5–8, 16–17. The opinion reasoned that the ERA's deadline was not in the proposed amendment's actual text and therefore concerned only a "'subsidiary matter[] of detail'" that Congress could revise by a simple majority vote of both Houses. *Id.* at 22–23 (quoting *Dillon*, 256 U.S. at 376).

In 1978, the House and Senate, acting by simple majorities, adopted a resolution extending the deadline for the ERA's ratification. 92 Stat. at 3799.[9] The ERA's supporters had initially sought to extend the ratification deadline by an additional seven years, but a compromise extended the deadline by just over three years, to June 30, 1982. *See* H.R. Rep. No. 95-1405, at 1 (1978). Although this Office had advised that the President

---

[9] The votes in the House and Senate were 233–189 and 60–36. 124 Cong. Rec. 26264, 34314 (1978).

need not sign a resolution concerning a constitutional amendment, *see Constitutionality of ERA Extension* at 25, President Carter chose to sign the extension resolution to demonstrate his support. *See* Equal Rights Amendment, Remarks on Signing H.J. Res. 638 (Oct. 20, 1978), 2 *Pub. Papers of Pres. Jimmy Carter* 1800 (1978) (acknowledging that "the Constitution does not require the President to sign a resolution concerning an amendment to the Constitution").

Several States and state legislators challenged the validity of the resolution extending the ratification deadline, and a federal district court held that Congress had exceeded its authority in passing the extension resolution. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1150–54 (D. Idaho 1981), *vacated as moot*, 459 U.S. 809 (1982). According to the district court, "[o]nce the proposal has been formulated and sent to the states, the time period could not be changed any more than the entity designated to ratify could be changed from the state legislature to a state convention or vice versa." *Id.* at 1153. The Supreme Court allowed briefing on appeals from the district court, granted certiorari before judgment in the court of appeals, and stayed the district court's judgment. *See Nat'l Org. for Women, Inc. v. Idaho*, 455 U.S. 918 (1982). But before the Court was able to address the validity of Congress's deadline extension on the merits, the extended deadline expired without ratifications by any additional States. The Court then vacated the district court's judgment and remanded the cases with instructions to dismiss the complaints as moot. *See Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982).

After the expiration of the 1982 deadline, many of the ERA's supporters acknowledged that the ratification effort had failed and would have to begin anew. *See* Berry, *Why ERA Failed* at 81 ("In the aftermath of ERA's defeat, proponents began to assess the reasons for failure."); *see also* Adam Clymer, *Time Runs Out for Proposed Rights Amendment*, N.Y. Times, July 1, 1982, at A12 ("The drive to ratify the proposed Federal equal rights amendment . . . failed tonight in the states, still three legislatures short of the 38 that would have made it the 27th Amendment to the Constitution."); Marjorie Hunter, *Leaders Concede Loss on Equal Rights*, N.Y. Times, June 25, 1982, at A1 ("Leaders of the fight for an equal rights amendment officially conceded defeat today."). The ERA's supporters in Congress offered new resolutions to reintroduce the ERA, which, if approved by two-thirds majorities, would have restarted the ratification process. *See* 128 Cong. Rec. 16106 (1982) (statement of Rep. Schroeder) (announcing that she, along with "200 Members of the House

and 51 Members of the Senate," had "reintroduced the equal rights amendment," and analogizing the new proposal to "the phoenix rising from the ashes"); *id.* at 16108–09 (statement of Rep. Rodino) (acknowledging that the previously proposed ERA "failed of ratification as of June 30," arguing that "what we need to do is to really go forward once again," and introducing a resolution to "begin the battle anew"); *see also* Berry, *Why ERA Failed* at 82 ("The supporters of ERA in Congress . . . did not give up the effort either. They announced on July 14, that they had fifty-one cosponsors in the Senate and 201 in the House to reintroduce ERA.").

In January 1983, Joint Resolution 1 was introduced in the House, proposing the ERA for ratification by state legislatures with a new seven-year deadline. *See* H.R.J. Res. 1, 98th Cong. (1983). The House voted on the resolution, but it fell short of the necessary two-thirds majority. *See* 129 Cong. Rec. 32668, 32684–85 (1983). In the following decades, similar resolutions were regularly introduced. *See, e.g.*, H.R.J. Res. 1, 101st Cong. (1989); S.J. Res. 1, 101st Cong. (1989); S.J. Res. 40, 103d Cong. (1993); H.R.J. Res. 41, 106th Cong. (1999); S.J. Res. 7, 109th Cong. (2005); H.R.J. Res. 69, 112th Cong. (2011); S.J. Res. 6, 115th Cong. (2017). None, however, was adopted. In the current Congress, similar resolutions were introduced in the House on January 29, 2019, *see* H.R.J. Res. 35, 116th Cong., and in the Senate on March 27, 2019, *see* S.J. Res. 15, 116th Cong. Two-thirds passage of either of those resolutions in both chambers of Congress would restart the ratification process by re-proposing the ERA to the States.

Separately, ERA supporters in recent years have sought to revive the expired ERA Resolution from 1972, contending either that the original deadline was legally invalid or that Congress may retroactively nullify the deadline decades after the original proposal's expiration. *See* Allison L. Held et al., *The Equal Rights Amendment: Why the ERA Remains Legally Viable and Properly Before the States*, 3 Wm. & Mary J. Women & L. 113 (1997).[10] In the current Congress, several proposed resolutions would

---

[10] *See also* Maggie Astor, *The Equal Rights Amendment May Pass Now. It's Only Been 96 Years*, N.Y. Times, Nov. 6, 2019 ("'It's been extended by Congress, so if you can extend it, you can certainly strike it,' said Representative Jackie Speier of California, the lead sponsor of a bipartisan House resolution to repeal the deadline."), https://www.nytimes.com/2019/11/06/us/politics/virginia-ratify-equal-rights-amendment.html; Dana Canedy, *Advocates of Equal Rights Amendment Resume Their Fight*, N.Y. Times, May 4, 2003, § 1, at 41 ("Supporters contend they can challenge the deadline if they can now find three more states to vote in favor of the amendment.").

purport to void the deadline in the ERA Resolution. *See* S.J. Res. 6, 116th Cong. (2019); H.R.J. Res. 79, 116th Cong. (2019); H.R.J. Res. 38, 116th Cong. (2019). The House Judiciary Committee voted on November 13, 2019 to report one of those resolutions favorably. *See* H.R.J. Res. 79, 116th Cong. (2019) (as amended).[11]

In seeking to revive the ERA, supporters have urged several States to ratify the ERA as proposed in the ERA Resolution. *See, e.g.*, Kristina Peterson, *Equal Rights Amendment Could Soon Be Back in Congress*, Wall St. J., July 3, 2019, https://www.wsj.com/articles/equal-rights-amendment-could-soon-be-back-in-congress-11562155202. In March 2017, Nevada's legislature approved it. S.J. Res. 2, 79th Leg. (Nev. 2017). In May 2018, the Illinois legislature did the same. S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018). The Virginia legislature narrowly failed to approve the amendment in 2019, but ERA supporters will try again this year.[12] If the ratification votes from 1972 to 1977 remain valid, and the five rescissions of those ratifications are disregarded, then thirty-seven of the States may be viewed as having approved the ERA Resolution. In that case, the approval by Virginia, or by another state legislature, would require a determination as to whether the ERA Resolution remains pending, notwithstanding the congressional deadline. The passage of House Joint Resolution 79, or a similar resolution, would likewise require a determination as to whether Congress may revive the ERA Resolution by retroactively removing the earlier deadline. Accordingly, you have requested our opinion on these matters.

---

[11] *See also* Press Release, H. Comm. on the Judiciary, *House Judiciary Committee Passes Resolution Removing Ratification Deadline for the ERA* (Nov. 13, 2019), https://judiciary.house.gov/news/press-releases/house-judiciary-committee-passes-resolution-removing-ratification-deadline-era.

[12] *See* Jenna Portnoy, *ERA Bill Dies for Good in GOP-Controlled Virginia House of Delegates*, Wash. Post, Feb. 21, 2019, https://www.washingtonpost.com/local/virginia-politics/virginia-house-kills-era-ratification-bill/2019/02/21/82920204-3560-11e9-854a-7a14d7fec96a_story.html (noting the narrow failure); Rachel Frazin, *Virginia Targets Historic Push on Equal Rights Amendment for Women*, The Hill, Dec. 1, 2019, https://thehill.com/homenews/state-watch/472295-virginia-targets-historic-push-on-equal-rights-amendment-for-women (noting that joint resolutions to ratify the ERA have been prefiled in both houses for consideration in the upcoming session).

## II.

Congress required that the ERA Resolution be ratified within a fixed period, and whether the effective deadline was in 1979 or 1982, that time has come and gone. The ERA Resolution thus has expired unless the deadline was somehow invalid in the first place. Yet in *Dillon*, the Supreme Court squarely upheld Congress's authority to set a ratification deadline, 256 U.S. at 374–76, and that conclusion is consistent not only with Article V of the Constitution, but with the history of the seven amendments proposed and ratified since *Dillon*. For the last four of those amendments, Congress placed the deadline in the proposing clause—the clause containing the procedural rules for ratification that, like the amendment itself, has always been adopted by two-thirds of both Houses of Congress. As Chief Justice Hughes suggested in his controlling opinion in *Coleman v. Miller*, 307 U.S. 433 (1939), a ratification deadline may be included "either in the proposed amendment or in the resolution of submission," *id.* at 452, and there is no reason in law or historical practice to draw any other conclusion. Because Congress lawfully conditioned the States' ratification of the ERA upon a deadline, and because the deadline expired, the proposed amendment has necessarily failed.

## A.

The Founders established a process for amending the Constitution that requires substantial agreement within the Nation to alter its fundamental law. As James Madison explained in *The Federalist*, the Founders chose to ensure a broad consensus in favor of any amendment to "guard[] . . . against that extreme facility which would render the Constitution too mutable," while at the same time avoiding "that extreme difficulty which might perpetuate its discovered faults." *The Federalist* No. 43, at 296 (James Madison) (Jacob E. Cooke ed., 1961); *see also id.* No. 85, at 592 (Alexander Hamilton) ("[W]henever . . . ten [of thirteen] states[] were united in the desire of a particular amendment, that amendment must infallibly take place." (footnote omitted)). The Constitution requires supermajorities in Congress (or of state legislatures) to propose an amendment. U.S. Const. art. V. It then raises the bar for ratification even higher by requiring three-fourths of the States—acting either through their legislatures or through ratifying conventions—to approve the amendment. *See id.*

The infrequency with which the Constitution has been amended attests not just to the genius of the original design but also to the difficulty inherent in securing the broad consensus required by Article V. In connection with promises made during the state ratifying conventions for the original Constitution, the First Congress in 1789 proposed twelve amendments to the States. *See* 1 Stat. 97 (1789); *see also, e.g.*, David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 110–115 (1997). By 1791, three-fourths of the States had approved ten of those twelve articles—the Bill of Rights. *See* U.S. Const. amends. I–X; *see also* 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 339–40 (2d ed. 1836). In the nearly 230 years since then, the States have ratified only seventeen additional amendments. *See* U.S. Const. amends. XI–XXVII.

Article V of the Constitution sets forth the procedures for proposing and ratifying constitutional amendments:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

*Id.* art. V.

The process for proposing amendments is one of only two instances where the Constitution requires both Houses of Congress to act by a supermajority.[13] The other is when Congress seeks to override the Presi-

---

[13] The Constitution alternatively provides that a supermajority (two-thirds) of the state legislatures may petition Congress to convene a convention for proposing amendments. U.S. Const. art. V. The Founders believed that this process would likely be unnecessary unless Congress had become corrupted. *See, e.g.*, 1 *The Records of the Federal Convention of 1787*, at 202–03 (Max Farrand ed., 1911); 1 *Blackstone's Commentaries* 371 (St.

dent's veto of a bill or other form of joint resolution. *See id.* art. I, § 7, cls. 2–3.[14] The Founders thus established a high bar by requiring that two-thirds of both Houses agree upon the terms of any amendment to be proposed to the States and that three-fourths of the States ratify the amendment on those terms.

The Constitution further grants Congress the authority to specify "one or the other Mode of Ratification" in the States, either by the legislatures thereof or by state conventions chosen for that purpose. *Id.* art. V. In adopting the Constitution, the people "deliberately made the grant of power to Congress in respect to the choice of the mode of ratification of amendments." *United States v. Sprague*, 282 U.S. 716, 733 (1931); *see also* 4 Elliot, *Debates in the Several State Conventions* at 177 (statement of James Iredell) ("Any amendments which either Congress shall propose, or which shall be proposed by such general convention, are afterwards to be submitted to the legislatures of the different states, or conventions called for that purpose, as Congress shall think proper[.]"). Congress therefore exercises discretion in determining not just the substance of the amendment, but which of the two modes of ratification is to be used. *See Sprague*, 282 U.S. at 732 (recognizing that "the choice of mode rests solely in the discretion of Congress").

In making such determinations, Congress has specified the mode of ratification in the proposing clause included within every resolution proposing a constitutional amendment. For every successful amendment, both Houses of Congress approved the proposing clause at the same time as the text of the proposed amendment, and they did so by a two-thirds vote. Congress included such a clause in the very first set of amendments proposed to the States, ten of which were ratified in 1791 as the Bill of Rights (and one of which was ratified in 1992 as the Twenty-Seventh Amendment). The resolution recited that Congress was proposing twelve

---

George Tucker ed., 1803) (observing that the convention process "will probably never be resorted to, unless the federal government should betray symptoms of corruption," and describing the convention process as a "radical and effectual remedy"). As a historical matter, the state legislatures have never successfully petitioned for such a convention, and every amendment proposed to the States to date has come from Congress in the first instance.

[14] The Constitution requires a two-thirds majority in the Senate to convict a civil officer in an impeachment trial, U.S. Const. art. I, § 3, cl. 6, and to give advice and consent to ratification of a treaty, *id.* art. II, § 2, cl. 2. It requires two-thirds of either House to concur in the expulsion of one of its Members. *Id.* art. I, § 5, cl. 2.

articles "to the legislatures of the several states, as amendments to the constitution of the United States, all or any of which articles, *when ratified by three fourths of the said legislatures*, to be valid to all intents and purposes, as part of the said Constitution." 1 Stat. at 97 (emphasis added). In every subsequent amendment proposed to the States, Congress has included a proposing clause reciting the intended mode of ratification.[15]

The proposing clause for the Bill of Rights not only specified the mode of ratification but also contained a procedural instruction authorizing the state legislatures either to ratify "all" twelve proposed articles or to ratify "any of" them individually. 1 Stat. at 97. This proposing clause was debated by the House and the Senate and considered of a piece with the substantive proposed amendments. *See* 4 *Documentary History of the First Federal Congress of the United States of America* 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986). Although the early resolutions proposing amendments did not include deadlines for ratification, seven-year deadlines were included in the texts of what became the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. When proposing the Twenty-Third Amendment in 1960, Congress included a similar seven-year deadline in the proposing clause, *see* 74 Stat. 1057 (1960), and every subsequent proposed amendment has also included, in its proposing clause, a requirement that the amendment be ratified within seven years. *See* 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); 85 Stat. 825 (1971) (Twenty-Sixth Amendment); 86 Stat. at 1523 (proposed ERA); 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).

---

[15] *See* 1 Stat. 402 (1794) (Eleventh Amendment); 2 Stat. 306 (1803) (Twelfth Amendment); 2 Stat. 613 (1810) (proposed Titles of Nobility Amendment); 12 Stat. 251 (1861) (proposed Article the Thirteenth); 13 Stat. 567 (1865) (Thirteenth Amendment); 14 Stat. 358 (1866) (Fourteenth Amendment); 15 Stat. 346 (1869) (Fifteenth Amendment); 36 Stat. 184 (1909) (Sixteenth Amendment); 37 Stat. 646 (1912) (Seventeenth Amendment); 40 Stat. 1050 (1917) (Eighteenth Amendment); 41 Stat. 362 (1919) (Nineteenth Amendment); 43 Stat. 670 (1924) (proposed Child Labor Amendment); 47 Stat. 745 (1932) (Twentieth Amendment); 48 Stat. 1749 (1933) (Twenty-First Amendment); 61 Stat. 959 (1947) (Twenty-Second Amendment); 74 Stat. 1057 (1960) (Twenty-Third Amendment); 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); 85 Stat. 825 (1971) (Twenty-Sixth Amendment); 86 Stat. 1523 (1972) (proposed ERA); 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).

Each of these deadlines was adopted as part of the same resolution that proposed each amendment by the required two-thirds majorities of both Houses of Congress.

**B.**

Article V does not expressly address how long the States have to ratify a proposed amendment. The "article says nothing about the time within which ratification may be had—neither that it shall be unlimited nor that it shall be fixed by Congress." *Dillon*, 256 U.S. at 371. The text does direct that "[t]he Congress, *whenever* two thirds of both Houses *shall deem it necessary*, shall propose Amendments to this Constitution[.]" U.S. Const. art. V (emphases added). This language authorizes Congress to propose amendments for ratification *when* two-thirds majorities in each chamber deem it necessary, thereby implying that Congress may propose amendments *for the period* that the requisite majorities deem necessary. *See Dillon*, 256 U.S. at 375 ("[I]t is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently."). Article V thus requires Congress to make a judgment concerning the needs of the moment and, from that, the Supreme Court has inferred the power to set a deadline by which the States must ratify, or reject, Congress's judgment. *See id.* at 375–76.

The Court reached this conclusion in *Dillon*, which upheld Congress's authority to impose a deadline for ratifying the Eighteenth Amendment, which established Prohibition. *See* U.S. Const. amend. XVIII, §§ 1–2. In section 3 of the Amendment, Congress conditioned its effectiveness upon the requirement that it be ratified within seven years. *See id.* § 3 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."). The Senate had previously considered proposing ratification deadlines for the Fourteenth and Fifteenth Amendments. *See* Cong. Globe, 40th Cong., 3d Sess. 912–13, 1309–14 (1869); Cong. Globe, 39th Cong., 1st Sess. 2771 (1866). But the Eighteenth Amendment was the first amendment to include one.

In *Dillon*, a prisoner detained in violation of the National Prohibition Act (which was enacted pursuant to federal power authorized by the Eighteenth Amendment) argued that the presence of the deadline invali-

dated the amendment because "Congress has no constitutional power to limit the time of deliberation or otherwise attempt to control what the legislatures of the States shall do in their deliberation." Br. for Appellant at 4, *Dillon v. Gloss*, 256 U.S. 368 (1921) (No. 251). In rejecting this claim, the Court observed that "some" of the first seventeen amendments had been ratified "within a single year after their proposal and all within four years." *Dillon*, 256 U.S. at 372. Four other proposed amendments, however, had failed to obtain the necessary votes from the States and "lain dormant for many years," leaving it an "open question" whether they "could be resurrected." *Id.* at 372–73. To avoid such future uncertainty, the Court explained, Congress fixed a seven-year deadline for the ratification of the Prohibition amendment. *Id.* at 373; *see also* 55 Cong. Rec. 5557 (1917) (remarks of Sen. Ashurst) (expressing support for a provision "limiting the time in the case of this amendment or any other amendment to 10, 12, 14, 16, 18, or even 20 years, so that we will not hand down to posterity a conglomerate mass of amendments floating around in a cloudy, nebulous, hazy way").

In upholding Congress's authority to impose deadlines, the Court recognized that Article V does not expressly address the timing of ratification. *See Dillon*, 256 U.S. at 371. It nevertheless read the text to imply a degree of contemporaneity between an amendment's proposal and its ratification, which "are not treated as unrelated acts but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time." *Id.* at 374–75. The Court inferred that the approval of three-fourths of the States needs to be "sufficiently contemporaneous . . . to reflect the will of the people in all sections at relatively the same period." *Id.* at 375. Thus, "'an alteration of the Constitution proposed today has relation to the sentiment and the felt needs of today,'" and "'if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.'" *Id.* at 375 (quoting, with alterations, John Alexander Jameson, *A Treatise on Constitutional Conventions* § 585, at 634 (4th ed. 1887)).[16] The Court therefore concluded

---

[16] The *Dillon* Court necessarily rejected Jameson's contention that, although Article V gives Congress the powers to propose an amendment and to express the mode of ratification, it does not grant Congress the power "to prescribe conditions as to the time within which amendments are to be ratified, and hence to do so would be to transcend the power given." Jameson, *A Treatise on Constitutional Conventions* § 585, at 634.

that "the fair inference or implication from article V is that the ratification must be within some reasonable time after the proposal." *Dillon*, 256 U.S. at 375.[17]

Having viewed Article V as implicitly including a requirement of contemporaneity, *Dillon* rejected the argument that Congress lacks the power to set the reasonable time for ratification. *See id.* at 375–76. The Court reasoned that, "[a]s a rule[,] the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and article V is no exception to the rule." *Id.* at 376 (footnote omitted). Therefore, "[w]hether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine[.]" *Id.* The Court concluded that Congress has the authority to impose a deadline upon the ratification process, reasoning that such a power is "an incident of its power to designate the mode of ratification" under Article V. *Id.*

## C.

Unlike with the Eighteenth Amendment, Congress placed the ratification deadline for the ERA Resolution in the proposing clause, rather than in the text of the proposed amendment. But that judgment was entirely consistent with the four preceding amendments, and with *Dillon*'s recognition that a deadline is related to the mode of ratification, which has always been included in the proposing clause. In placing the ERA's deadline in the proposing clause, Congress followed a practice that started with the Twenty-Third Amendment. *See* 74 Stat. at 1057 (resolving "that the following article is hereby proposed . . . which shall be valid to all intents and purposes as part of the Constitution only if ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by Congress"). Congress took the same

---

[17] In *Congressional Pay Amendment,* this Office concluded that "*Dillon* is not authoritative on the issue whether Article V requires contemporaneous ratification" in the absence of any congressional deadline, because the Eighteenth Amendment contained a deadline. 16 Op. O.L.C. at 92–93. Finding no time limit in Article V, we concluded that the Twenty-Seventh Amendment, which was proposed without a deadline in 1789, had been adopted in 1992. *See id.* at 97, 105. Because the ERA Resolution contained a deadline (which has expired), we do not need to consider in this opinion the 1992 opinion's reading of *Dillon*.

course in the proposing clauses of the Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments. *See* 76 Stat. at 1259; 79 Stat. at 1327; 85 Stat. at 825. There is no reason for deadlines declared in proposing clauses to be any less binding on the ratification process than those included in the text of proposed amendments.

In *Dillon*, the Supreme Court held that Congress's decision to fix "a definite period for ratification" is "a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification" under Article V. 256 U.S. at 376. In the first resolution proposing constitutional amendments, Congress identified the mode of ratification in the resolution's proposing clause, separate from the text of the proposed amendments themselves. *See supra* pp. 14–15. Congress has specified the mode of ratification in the proposing clause of every resolution proposing a constitutional amendment since then. *See supra* note 15. Each time, two-thirds of both Houses of Congress approved these measures. Insofar as Congress and the States have relied upon proposing clauses to specify the mode of ratification since 1789, we think it clear that Congress may exercise its integrally related authority to set a deadline in precisely the same manner. Chief Justice Hughes suggested as much when he observed that the Child Labor Amendment did not include a ratification deadline "either in the proposed amendment or in the resolution of submission." *Coleman*, 307 U.S. at 452.

As we recognized in 1977, "[t]he history of congressional use of a seven-year limitation demonstrates that Congress moved from inclusion of the limit in the text of proposed amendments to including it within the proposing clauses . . . without ever indicating any intent to change the substance of their actions." *Constitutionality of ERA Extension* at 15. After the Court's 1921 decision in *Dillon* confirmed the validity of the Eighteenth Amendment's ratification deadline, Congress included a seven-year deadline in the Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amend. XX, § 6 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission."); *id.* amend. XXI, § 3 ("This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."); *id.* amend. XXII, § 2 ("This article shall be inoperative unless it shall have been ratified as an

amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress."). By including such a provision in the amendment itself, Congress ensured that approvals secured after the seven-year deadline would be ineffective. Even if three-fourths of the States later ratified the amendment—and it therefore became "valid to all Intents and Purposes, as Part of [the] Constitution," *id.* art. V—the amendment, by its own terms, would be legally inert.

Members of Congress recognized, however, that these textual deadlines came at a cost. With each amendment, the Nation's highest law became increasingly cluttered with extraneous sections imposing conditions on ratification that had no prospective effect. Once three-fourths of the States ratified amendments within the prescribed deadlines, the deadlines, having already fulfilled their purpose, were nonetheless added to the constitutional text. To avoid exacerbating that problem, Congress adopted an alternative way of setting a ratification deadline when it proposed the Twenty-Third Amendment. Rather than including the deadline in the amendment's text, Congress put it in the proposing clause specifying the mode of ratification. *See* 74 Stat. at 1057. As Senator Kefauver had explained:

> The general idea was that it was better not to make the 7-year provision a part of the proposed constitutional amendment itself. It was felt that that would clutter up the Constitution. . . . We wanted to put the 7-year limitation in the preamble. So the intention of the preamble is that it must be ratified within 7 years in order to be effective.

101 Cong. Rec. 6628 (1955); *see also Appointment of Representatives: Hearing on S.J. Res. 8 Before a Subcomm. of the S. Comm. on the Judiciary*, 84th Cong. 34 (1955) (letter from Prof. Noel Dowling) ("The 7-year limitation is put in the resolution rather than in the text of the amendment. There is no doubt about the power of Congress to put it there; and it will be equally effective. The usual way, to be sure, has been to write the limitation into the amendment; but we hope such an unnecessary cluttering up of the Constitution can be ended.").[18]

---

[18] In connection with the Twentieth Amendment, Representative Emanuel Celler had proposed placing the seven-year deadline in the proposing clause, but that approach drew objections. 75 Cong. Rec. 3856–57 (1932). Representative Lamar Jeffers protested that, "[i]f the gentleman wants his amendment in the Constitution, it should go in a new

Congress thereafter adopted the Twenty-Third Amendment resolution, including the seven-year deadline, by a two-thirds majority of both Houses. 106 Cong. Rec. 12571, 12858 (1960); *see* 74 Stat. at 1057. The States promptly ratified the amendment within ten months. *See* Certification of Amendment to Constitution of the United States Granting Representation in the Electoral College to the District of Columbia, 26 Fed. Reg. 2808 (Apr. 3, 1961). And Congress repeated the very same course by including deadlines in the proposing clauses for the Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth Amendments. *See* 76 Stat. at 1259; 79 Stat. at 1327; 85 Stat. at 825.[19] In 1977, we observed that Congress appears to have adopted this approach without any discussion about potentially placing the deadlines elsewhere. *See Constitutionality of ERA Extension* at 14–15. And we have found no indication that Members of Congress (or any court) seriously questioned the binding nature of a deadline stated in a resolution's proposing clause rather than the text of its proposed amendment.

In the case of the ERA Resolution, Congress again included a ratification deadline in the proposing clause. Members suggested that, by this time, it had become the customary way of setting a deadline. *See, e.g.*, S. Rep. No. 92-689, at 20 (1972) (describing the deadline as part of the "traditional form of a joint resolution proposing a constitutional amendment for ratification by the States" and stating that it "has been included in every amendment added to the Constitution in the last 50 years"). The deadline was widely understood to be a necessary part of the legislative compromise that resulted in the resolution's passage. Prominent ERA

---

section, or section 6. As he has now offered it, it would be of no avail, as he is offering it as a part of the proposal clause and not as a part of the proposed constitutional amendment." *Id.* at 3856; *see also id.* (statement of Rep. Ramseyer) ("The eighteenth amendment carried that 7-year provision as section 3, and it was that provision that the Supreme Court held to be valid. . . . I think we should play safe, inasmuch as the Supreme Court has held the provision valid."); *see also Constitutionality of ERA Extension* at 10–11 (discussing this history). We have not identified the expression of any similar concern with respect to the Twenty-Third or any subsequent Amendment, and, as discussed below, we believe this concern is misplaced.

[19] In proposing the Twenty-Third and Twenty-Fourth Amendments, Congress provided that the amendment would be valid "*only if* ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission" (emphasis added). Starting with the Twenty-Fifth Amendment, Congress replaced "only if" with "when." As we recognized in 1977, this change did not alter the meaning of the resolution or the binding nature of the deadline. *See Constitutionality of ERA Extension* at 15.

opponents had faulted an earlier version of the resolution for the absence of a deadline. *See, e.g.*, 116 Cong. Rec. at 28012 (remarks of Rep. Celler, Chairman of the House Judiciary Committee) (decrying the fact that, without a deadline, "[t]his amendment could roam around State legislatures for 50 years" and arguing that the "customar[y]" seven-year deadline should be added); *id.* at 36302 (remarks of Sen. Ervin) (proposing a seven-year deadline and noting that "we still have floating around some unratified amendments that were submitted at the time of the original submission of the Bill of Rights"). And ERA supporters confirmed that, while they expected prompt ratification, the seven-year deadline would impose a binding time limit. *See* 117 Cong. Rec. at 35814–15 (remarks of Rep. Griffiths) (recognizing that the deadline will ensure that the resolution "should not be hanging over our head forever"); 118 Cong. Rec. at 9552 (remarks of Sen. Hartke) (recognizing that if the ERA is not "ratified within 7 years," then "we must begin the entire process once again"). In proposing the ERA to the States with a deadline, Members of Congress thus recognized that the deadline was a binding condition upon its ratification.

Apart from the seven-year deadline in the proposing clause, the ERA Resolution included a separate timing requirement—a delay on effectiveness for two years after ratification—in section 3 of the text of the proposed amendment. But this distinction did not make the seven-year deadline any less mandatory than the two-year delay. Unlike with ratification deadlines, Congress has never placed an amendment's delayed effective date in a proposing clause. Nor is it clear that it could effectively do so, because Article V declares that a proposed amendment "shall be valid to all Intents and Purposes, as Part of [the] Constitution, *when ratified*." U.S. Const. art. V (emphasis added). Including the two-year delay in the amendment itself could be necessary to amend the effect that Article V would otherwise have on the amendment's effective date.

After Congress proposed the ERA Resolution, state legislatures considered whether to ratify it subject to all of the conditions imposed by Congress, including the seven-year deadline. Of the thirty-five state legislatures that ratified between 1972 and 1977, twenty-five expressly voted upon a state measure that included the text of the ERA Resolution in its entirety (and hence the deadline). *See Senate Extension Hearings* at 739–54, 756–61. Five others did not expressly vote on the entire text of the ERA Resolution, but the seven-year deadline was otherwise repeated in the measures that they approved. *See id.* at 739–40, 742–43, 746–47,

752–54, 758. And South Dakota's legislature expressly provided that its ratification would be formally withdrawn if the ERA were not adopted within the seven-year deadline. S.J. Res. 2, 54th Leg. (S.D. 1979). Accordingly, the States that ratified the ERA Resolution plainly did so with the knowledge of the timing condition and with the understanding that the seven-year deadline was part and parcel of the amendment proposal.

Although some ERA supporters have recently questioned the enforceability of the deadline, no one involved with the ERA around the time of its proposal seems to have done so. As the original ratification period neared its end, Congress weighed extending the deadline precisely to avoid the failure of the amendment. For instance, Representative Elizabeth Holtzman, the primary sponsor of the extension resolution, testified that "[t]he cosponsors of [the] resolution have every hope that the equal rights amendment will be ratified before March 22, 1979, but do believe there might be need for an insurance policy *to assure that the deadline will not arbitrarily end all debate on the ERA*." *House Extension Hearings* at 4 (emphasis added). And while this Office advised that Congress could extend the deadline, we nonetheless recognized that the proposed amendment would otherwise expire. *See Constitutionality of ERA Extension* at 15.

Even more telling, the Supreme Court necessarily recognized the enforceability of the deadline by finding that the legal controversy over the ERA extension became moot when the extended deadline lapsed. After the district court in *Idaho v. Freeman* held that Congress could not extend the deadline, the federal government and others sought review in the Supreme Court. *See, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert. Before J., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982); Pet. for Writ of Cert. Before J., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). Although the Court accepted review, the June 1982 deadline expired before it could hear argument. At that point, the Acting Solicitor General urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented." Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982). Other parties objected to that conclusion on prudential grounds, but none argued that the deadline was unenforceable.[20] The

---

[20] *See, e.g.*, Response of Nat'l Org. for Women, Inc., et al., to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3–5, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282

Supreme Court remanded with instructions "to dismiss the complaints as moot." *Nat'l Org. for Women*, 459 U.S. at 809. In so doing, the Court necessarily adopted the view that Congress had validly imposed a ratification deadline that had expired. *See* Response of Nat'l Org. for Women, Inc., et al., to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (July 23, 1982) ("Even an unexplained ruling that this case is moot would necessarily signal implicit acceptance of [the Acting Solicitor General's] position, particularly in light of this Court's stay of January 25.").

All of this history confirms that the deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress's authority to set a deadline on ratification. Congress in 1972 required the ERA to be ratified by a certain date as an incident to its authority to set the mode of ratification. *See Dillon*, 256 U.S. at 376. Two-thirds of both Houses of Congress approved the amendment with that accompanying condition, and the state legislatures that ratified did so as well. Under the text and structure of Article V, and consistent with the Court's opinion in *Dillon*, that condition was legally effective. Because the deadline lapsed without ratifications from the requisite thirty-eight States, the ERA Resolution is no longer pending before the States, and ratification by additional state legislatures would not result in the ERA's adoption.

## III.

Although the ERA Resolution expired decades ago, there remains the question whether Congress may revive the ERA ratification process. As noted above, the House Judiciary Committee has favorably reported a joint resolution "[r]emoving the deadline for the ratification of the equal rights amendment," which would purport to make the ERA "valid to all intents and purposes as part of the United States Constitution whenever ratified by the legislatures of three-fourths of the several States." H.R.J.

---

et al. (U.S. July 23, 1982) (arguing that notwithstanding the expiration of the deadline, the Court should address whether the validity of the extension presented a political question); Response of Washington Appellees and Respondents to Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 4, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. Aug. 10, 1982) ("One might think that a scheme to secure ratification past the expiration of the second deadline is patently ludicrous. However, it also seemed ludicrous prior to 1978 to suggest an extension of time for the ratification of a constitutional amendment by a simple majority vote.").

Res. 79, 116th Cong. (as ordered to be reported by H. Comm. on the Judiciary, Nov. 13, 2019); *see also supra* note 11 and accompanying text. We therefore must consider whether this pending resolution, if adopted by both Houses of Congress, would reopen the ratification of the ERA Resolution.

Congress, of course, could restart the amendment process by reproposing the ERA to the States. We do not believe, however, that Congress in 2020 may change the terms upon which the 1972 Congress proposed the ERA for the States' consideration. Article V does not expressly or implicitly grant Congress such authority. To the contrary, the text contemplates no role for Congress in the ratification process after it proposes an amendment. Moreover, such a congressional power finds no support in Supreme Court precedent. While the controlling opinion in *Coleman* suggested that Congress—and not the Court—may judge what constitutes "a reasonable limit of time for ratification," the opinion concerned only those instances "when the limit has not been fixed in advance." 307 U.S. at 454 (opinion of Hughes, C.J.). By its own terms, that opinion does not extend to the circumstances of the ERA, where Congress fixed a deadline before the proposal went to the States and that period has now expired.

## A.

Those who believe that the ERA Resolution may be revived argue that Congress's authority under Article V would allow simple majorities in each House to eliminate the earlier ratification deadline and thereby extend the ratification process. *See* 165 Cong. Rec. H8741 (daily ed. Nov. 8, 2019) (statement of Rep. Speier) (identifying Article V as the constitutional authority for House Joint Resolution 79). Relying upon Congress's prior action to extend the ERA deadline, they argue that, since the deadline rests in the proposing clause rather than the amendment's text, it is open to congressional revision at any time, including decades after its expiration. *See, e.g.*, Held, 3 Wm & M. J. Women & L. at 128–29; Astor, *supra* note 10 ("'It's been extended by Congress, so if you can extend it, you can certainly strike it,' said Representative Jackie Speier of California, the lead sponsor of a bipartisan House resolution to repeal the deadline."). They contend not only that this approach would permit the States to ratify the ERA Resolution long after the deadline, but that the thirty-five ratifications from the 1970s, as well as the two from the 2010s,

would count towards the thirty-eight necessary to complete ratification.[21] Despite Congress's having proposed the ERA Resolution to the States with an express deadline, and the state legislatures' having voted upon it with that understanding, this contingent of ERA supporters believes that a concurrent resolution of Congress could void that earlier widespread understanding.

We do not believe that Article V permits that approach. Congress's authority to fix a "definite period for ratification" is "an incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376. Congress may fix such a deadline for a proposed amendment "so that all may know what it is and speculation on what is a reasonable time may be avoided." *Id*. Congress would hardly be setting a "*definite* period for ratification" if a later Congress could simply revise that judgment, either by reducing, extending, or eliminating the deadline that had been part of the proposal transmitted to the States. While Congress need not set any ratification deadline, once it has done so, "that determination of a time period becomes an integral part of the proposed mode of ratification." *Idaho v. Freeman*, 529 F. Supp. at 1152–53. "Once the proposal has been formulated and sent to the states, the time period could not be changed any more than the entity designated to ratify could be changed from the state legislature to a state convention or vice versa." *Id.* at 1153.

When Congress "propose[s]" an amendment, it also selects the "Mode of Ratification." U.S. Const. art. V. The power to "propose" authorizes Congress to set the terms upon which the amendment will be considered by others, namely the States. *See* 2 Noah Webster, *American Dictionary of the English Language* s.v. PROPOSE (1828) (defining the transitive verb *propose*: "To offer for consideration, discussion, acceptance or adoption; as, to *propose* a bill or resolve to a legislative body[.]"); 2 Samuel Johnson, *A Dictionary of the English Language* s.v. To PRO-POSE (6th ed. 1785) ("To offer to the consideration."). Once Congress has "propose[d]" an amendment and selected the mode of ratification as "may be proposed by the Congress," the States then determine whether the proposal will be ratified. U.S. Const. art. V. As we recognized in our

---

[21] Notably, these proponents further argue that States may not rescind their earlier ratifications, which means that a resolution would amend the terms of the proposal upon which the state legislatures voted between 1972 and 1977 and purportedly lock them into their earlier votes upon different terms, without any input from, or opportunity for reconsideration by, those legislatures. *See, e.g.*, Held, 3 Wm & M. J. Women & L. at 131–34.

1992 opinion concerning the Twenty-Seventh Amendment, "[n]othing in Article V suggests that Congress has any further role. Indeed, the language of Article V strongly suggests the opposite[.]" *Congressional Pay Amendment*, 16 Op. O.L.C. 85, 102 (1992).[22] The power to propose is thus a prospective power, and does not entail any authority to modify the terms of a proposed amendment once it has been offered for the consideration of the States.

Consistent with the Constitution's federal structure, Congress and the state legislatures are "separate legislative bodies representing separate sovereignties and agencies of the people." Michael Stokes Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677, 689 (1993). Congress has the responsibility to propose the text of an amendment and the terms under which the States may ratify it, but once it has done so, Congress may not directly regulate the States in the performance of their distinct constitutional responsibilities. *Cf. Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (recognizing that the Founders made a "decision to withhold from Congress the power to issue orders directly to the States"). If anything, Article V operates in precisely the opposite direction by authorizing the state legislatures themselves to require Congress to call a constitutional convention to propose new amendments.[23] Article V goes on to confirm that Congress lacks any continuing authority over ratification by providing that the States' ratification of what Congress proposed

---

[22] *See also* 56 Cong. Rec. 446 (1917) (statement of Rep. Lenroot) ("Article V expressly provides that once this proposed amendment has gone from the halls of Congress and rests with the States, when ratified by the States it becomes a part of the Constitution."); Walter Dellinger, *Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 398 (1983) (The Constitution "requires no additional action by Congress or by anyone else after ratification by the final state."); Grover Rees III, *Throwing Away the Key: The Unconstitutionality of the Equal Rights Amendment Extension*, 58 Tex. L. Rev. 875, 899 (1980) (arguing that Article V requires only "proposal by Congress" and "ratification by the states," not "final 'acceptance' by Congress").

[23] As noted above, *see supra* note 13, the Founders expressed concern that the national government might block necessary amendments, and they therefore included in Article V a mechanism to ensure that the States could amend the Constitution even over the objection of Congress by allowing two-thirds of the state legislatures to direct Congress to convene a convention to propose such new constitutional amendments. *See Federalist* No. 85, at 593 (Alexander Hamilton) ("By the fifth article of the plan the congress will be *obliged*, 'on the application of the legislatures of two thirds of the states . . . to call a convention for proposing amendments.'").

is self-executing. Upon the approval of "three fourths" of the state legislatures or of state ratifying conventions, the amendment "shall be valid to all Intents and Purposes, as Part of th[e] Constitution." U.S. Const. art. V. In other words, the amendment becomes immediately effective, and Article V contemplates no additional role for Congress in modifying the proposal or in accepting or approving ratifications by the States.

For these reasons, constitutional commentators have long recognized that "Congress may not withdraw an amendment once it has been proposed." *Constitutionality of ERA Extension* at 18 n.22; *see also* Lester Bernhardt Orfield, *The Amending of the Federal Constitution* 51–52 (1942) ("The practice has been to regard such a withdrawal as ineffectual. The theory apparently is that each affirmative step in the passage of an amendment is irrevocable."); Charles K. Burdick, *The Law of the American Constitution* 39 (1922) ("It seems safe to assert that Congress, having once submitted a proposed constitutional amendment to the States, cannot thereafter withdraw it from their consideration[.]"); Jameson, *A Treatise on Constitutional Conventions* § 585 at 634 ("[T]he Federal Constitution, from which Congress alone derives its power to submit amendments to the States, does not provide for recalling them upon any event or condition; and . . . the power to recall cannot be considered as involved in that to submit, as necessary to its complete execution. It therefore cannot exist."). Similarly, we believe that Article V does not authorize Congress to adjust the terms of an amendment previously proposed to the States, whether it seeks to alter the mode of ratification or the deadline for ratification.

Recognizing congressional authority to modify the terms of a proposed constitutional amendment would present numerous questions that lack answers in the text of the Constitution or the history of past amendments. Could Congress modify a substantive provision within a pending amendment, or is its modification power limited to procedural terms? Could a later Congress hostile to a pending amendment shorten the deadline or declare it expired (and if so, how would such a power differ from a power to withdraw the pending amendment)? Must Congress adopt such changes by the same two-thirds vote of both Houses by which an amendment is proposed, or would a simple majority vote of each House suffice? And must the President sign the joint resolution modifying a proposal, or would the modification become immediately effective without presentment? *Compare* U.S. Const. art. I, § 7, cls. 2–3, *with Hollingsworth v. Virginia*, 3 U.S. (3 Dall.) 378, 381 n.*, 382 (1798). In concluding that

Congress could extend the ERA's deadline, our 1977 opinion hazarded answers to all of these questions, while recognizing the absence of any authoritative guidance from the Constitution, caselaw, or historical practice. *See Constitutionality of ERA Extension* at 16–26. We think that the better inference to draw from the Constitution's silence is that there is no modification authority in the first place. If Congress wants to remove a ratification deadline from a proposed amendment, then it must propose an entirely new constitutional amendment, giving the States a new opportunity to consider that proposal. Article V does not provide for any other supervisory mechanism by which Congress can adjust those terms.

## B.

Although the text of Article V does not contemplate any further role for Congress after it has proposed a constitutional amendment, the Supreme Court suggested one exception in *Coleman*, where a majority of justices concluded that, when a proposed amendment contains no deadline, then Congress, not the courts, should have the responsibility for deciding whether the States had ratified the amendment within a reasonable time. In *Coleman*, members of the Kansas legislature had challenged the State's 1937 ratification of the Child Labor Amendment based, in part, on the ground that it was untimely because Congress had proposed the amendment in 1924. *See* 307 U.S. at 436. In addressing that question, the Court fractured on whether *Dillon*'s requirement that an amendment be ratified within a "reasonable time" was a matter subject to judicial resolution. There was no majority opinion, but two separate opinions, joined by a total of seven justices, agreed that where a proposed amendment lacked any deadline, what constituted a "reasonable time" for ratification was a nonjusticiable political question.

Chief Justice Hughes's controlling opinion, which was joined by Justices Stone and Reed and styled as the "Opinion of the Court," concluded that the political branches, and not the Court, should decide whether an amendment had been ratified within a "reasonable time." *See Coleman*, 307 U.S. at 454 (opinion of Hughes, C.J.). In so ruling, he reasoned that "the question of a reasonable time in many cases would involve . . . an appraisal of a great variety of relevant conditions, political, social and economic," and these conditions were "appropriate for the consideration of the political departments of the Government." *Id.* at 453–54. The Chief Justice advised that Congress should address that question "when, in the

presence of certified ratifications by three-fourths of the States, *the time arrives for the promulgation of the adoption of the amendment*." *Id.* at 454 (emphasis added). Justice Black, joined by Justices Roberts, Frankfurter, and Douglas, would have gone further and treated any congressional proclamation that an amendment had been ratified as "final" and "'conclusive upon the courts.'" *Id.* at 457 (Black, J., concurring) (quoting *Leser v. Garnett*, 258 U.S. 130, 137 (1922)).[24]

Neither of these *Coleman* opinions identified any textual foundation for any power of Congress to "promulgate" an amendment ratified by three-fourths of the States. The dissenting justices criticized the majority opinions for addressing a point that had not been "raised by the parties or by the United States appearing as amicus curiae." *Id.* at 474 (Butler, J., dissenting). And *Coleman*'s conclusion has been frequently criticized as lacking foundation in the text, caselaw, or historical practice of congressional amendments. *See, e.g.*, *Congressional Pay Amendment*, 16 Op. O.L.C. at 99 ("[C]ongressional promulgation is neither required by Article V nor consistent with constitutional practice."); Dellinger, 97 Harv. L. Rev. at 403 ("[T]he *Coleman* Court largely manufactured the anticipated event of congressional promulgation to which it was deferring."); Rees,

---

[24] Justice Black's separate opinion, which would appear to view every question about the adoption of a constitutional amendment as a political question, is difficult to square with *Dillon* and several other cases where the Supreme Court has addressed the validity of congressional action on constitutional amendments. *See, e.g.*, *National Prohibition Cases*, 253 U.S. 350 (1920) (holding that the requirements of Article V were met in connection with the adoption of the Eighteenth Amendment); *Sprague*, 282 U.S. at 716 (rejecting the claim that Congress was obliged to call a convention to propose the Eighteenth Amendment); *Hollingsworth*, 3 U.S. at 381 n.*, 382 (stating that "[t]he negative of the President applies only to the ordinary cases of legislation," and thus holding that the Eleventh Amendment had been "constitutionally adopted"). As then–Circuit Judge John Paul Stevens recognized, "since a majority of the [*Coleman*] Court refused to accept [Justice Black's] position in that case, and since the Court has on several occasions decided questions arising under article V, even in the face of 'political question' contentions, that argument is not one which a District Court is free to accept." *Dyer v. Blair*, 390 F. Supp. 1291, 1299–1300 & n.20 (N.D. Ill. 1975) (Stevens, J.) (footnote omitted). In contrast with cases involving the requirements of Article V, the Court has treated questions about whether a State has ratified an amendment as nonjusticiable. *See Leser*, 258 U.S. at 137 (holding a State official's "duly authenticated" acknowledgement of ratification to be "conclusive upon the courts"); *cf. White v. Hart*, 80 U.S. 646, 649 (1871) (suggesting, in dictum, that the Court could not review Congress's decision to require Georgia to ratify the Fourteenth and Fifteenth Amendments as a condition of regaining representation in Congress after the Civil War).

58 Tex. L. Rev. at 887 ("*Coleman* was a very bad decision when handed down, and the Court almost certainly would decide it differently today.") (footnote omitted). Nothing in Article V suggests that Congress has any role in promulgating an amendment after it has been ratified by the requisite number of state legislatures or conventions. To the contrary, *Dillon* held that the ratification of the Eighteenth Amendment was "consummated" on the date that the thirty-sixth State had ratified it, and not thirteen days later when the Acting Secretary of State had proclaimed it under the statutory predecessor to 1 U.S.C. § 106b. *See Dillon*, 256 U.S. at 376. The Court in *Dillon* did not suggest that there was any need for Congress to promulgate the amendment, and Congress did not purport to do so.

Chief Justice Hughes's opinion would create a strange situation in which state legislatures voting on an amendment would not know until after the fact—and potentially long after the fact—whether a future Congress would conclude that their ratifications had occurred within a "reasonable time." *See Congressional Pay Amendment*, 16 Op. O.L.C. at 95 ("In order to be able to carry out its function in the ratification process, any state that is contemplating ratification must know whether an amendment is in fact pending before it. That is not a matter of degree; the proposed amendment is either pending or not."). Such a scenario would not only be a constitutional anomaly, it would directly conflict with Article V's command that, "when ratified" by three-fourths of the States, an amendment "*shall be valid* to all Intents and Purposes, as Part of this Constitution." U.S. Const. art. V (emphasis added).[25]

Chief Justice Hughes's analysis relied upon the role that Congress had played in the "special circumstances" surrounding the ratification of the Fourteenth Amendment during Reconstruction. *Coleman*, 307 U.S. at 449–50. There, Secretary of State George Seward had responded to irregularities in the ratifications of Ohio and New Jersey by issuing a conditional certification of the amendment "if the resolutions of the legislatures of Ohio and New Jersey . . . are to be deemed as remaining in full force and effect." Proclamation No. 11, 15 Stat. 706, 707 (1868). The House

---

[25] In addition, the *Coleman* rule would suggest that Congress could block a constitutional amendment that was proposed, over Congress's objection, by a convention called by the States, simply by declaring that the States had not ratified it within a "reasonable time." And because Congress's decision to block the amendment would be a political question, no court could second-guess that determination. That would vitiate the States' affirmative power under Article V to bypass Congress. *See supra* notes 13 and 23.

and Senate responded by adopting a concurrent resolution declaring the Fourteenth Amendment to be part of the Constitution. *See* Proclamation No. 13, 15 Stat. 708, 709–10 (1868). One week later, the Secretary of State issued a second proclamation "in execution of" the States' ratifications and the concurrent resolution certifying the Fourteenth Amendment. *Id.* at 710–11.

Based on that one episode, Chief Justice Hughes concluded that Congress could determine the timeliness of Kansas's ratification if and when Congress exercised its promulgation authority after three-fourths of the States had submitted ratifications. But that vision of Congress's role in the ratification process was "inconsistent with both the text of Article V of the Constitution and with the bulk of past practice." *Congressional Pay Amendment*, 16 Op. O.L.C. at 102. As Professor Walter Dellinger later observed, "[t]he action of the Reconstruction Congress with respect to the fourteenth amendment was literally unprecedented." Dellinger, 97 Harv. L. Rev. at 400. Congress had played no official role in promulgating the first thirteen amendments or any amendment since. Indeed, only two of the other twenty-six amendments have been the subject of any congressional action at all, and in neither case was Congress's action deemed necessary to promulgate the amendment.[26] Accordingly, the notion of a freestanding authority of Congress to determine the validity of a constitutional amendment after the States have submitted their ratifications finds little support in the text of Article V, historical practice, or other Supreme Court precedent.

---

[26] The Fifteenth Amendment, like the Fourteenth, was plagued with Reconstruction irregularities, and the Senate initially referred to committee a joint resolution declaring the Amendment to be valid and part of the Constitution, but it later passed a simple resolution requesting the views of the Secretary of State. Cong. Globe, 41st Cong., 2d Sess. 1444, 1653 (1870). The Secretary of State thereafter proclaimed the Fifteenth Amendment on March 30, 1870. *See* Proclamation No. 10, 16 Stat. 1131–32 (1870). The House then adopted its own resolution declaring the amendment's validity, Cong. Globe, 41st Cong., 2d Sess. 5441 (1870), but the Senate never took up the measure. With respect to the Twenty-Seventh Amendment, the Archivist certified the ratification in reliance upon the opinion of this Office. *See* Certification of Amendment to the Constitution of the United States Relating to Compensation of Members of Congress, 57 Fed. Reg. 21187 (1992). The House and the Senate later passed separate versions of concurrent resolutions that would have confirmed the amendment's validity. *See* H.R. Con. Res. 320, 102d Cong. (1992); S. Con. Res. 120, 102d Cong. (1992).

Moreover, to the extent that Chief Justice Hughes's *Coleman* opinion (joined by only two other Justices) represents a precedential holding of the Court, *see Marks v. United States*, 430 U.S. 188, 193 (1977), it still would not authorize Congress to revive the long-expired ERA Resolution. *Coleman* addressed whether an amendment, which had been proposed thirteen years earlier, could still be ratified within a "reasonable time," and the Court held that the political branches, not the Court, must decide that question. *See Coleman*, 307 U.S. at 454 (opinion of Hughes, C.J.). Although Chief Justice Hughes contemplated that, where an amendment's proposal lacked a ratification deadline, Congress could determine timeliness after the States had ratified the amendment, he did not suggest that Congress could nullify a deadline it had previously imposed on the States.

To the contrary, the Chief Justice repeatedly emphasized that Congress had not imposed any deadline on the Child Labor Amendment. His opinion stated that "[n]o limitation of time for ratification is provided *in the instant case* either in the proposed amendment or in the resolution of submission." *Id.* at 452 (emphasis added). The Court assumed that the question of "what is a reasonable time" may be "an open one *when the limit has not been fixed in advance*" by Congress. *Id.* at 454 (emphasis added). But it concluded that, even if an amendment would lapse after some period, "it does not follow that, whenever Congress has not exercised that power, the Court should take upon itself the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications." *Id.* at 452–53. The opinion thus repeatedly made clear that the Court was addressing the case where Congress did not include a deadline when proposing the amendment. Nothing in *Coleman* supports the view that when Congress proposed an amendment and included a time limit "in the resolution of submission," *id.* at 452, it would later be free to revise that judgment.

## C.

Apart from *Coleman* itself, the proponents of reviving the ERA ratification process rely heavily upon Congress's 1978 decision to modify the ERA's original deadline before it expired. The precedent of the ERA extension, however, is a thin reed. The action reflected something that Congress had never done before in our Nation's history, and the only federal court to review the measure held it unconstitutional. *See Idaho v. Freeman*, 529 F. Supp. at 1153. Although this Office at the time issued an

opinion recognizing Congress's authority to extend the deadline, we recognized that it was "difficult to conclude with certainty that [the extension resolution] is or is not constitutional," and that "respectable arguments can be made on both sides of this question." *Constitutionality of ERA Extension* at 1, 7. Since then, this Office has adopted a narrower view of *Coleman* than the one reflected in our 1977 opinion, but even if we adhered to all of the reasoning in the 1977 opinion, we do not believe that opinion would support reviving the ERA Resolution nearly forty years after the deadline expired.

In *Constitutionality of ERA Extension*, this Office concluded that, when the ratification deadline was not placed in the text of the proposed constitutional amendment, but only in the proposing clause, that condition on ratification should be treated as equivalent to a statute subject to congressional modification. *See id.* 7–8, 15–16. The Office relied on *Coleman* as recognizing a congressional authority "years after an amendment has been proposed . . . to determine the reasonableness of the intervening time period" and to modify a deadline placed in the proposing clause. *Id.* at 7–8. At the same time, our opinion admitted that there was an argument that "Art[icle] V itself can be viewed as envisioning a process whereby Congress proposes an amendment and is divested of any power once the amendment is submitted to the States for ratification," and that, "[a]s suggested by the language of the *Coleman* opinion, the question of a time limit is no longer open once a time limit is imposed by the proposing Congress." *Id.* at 7.

This Office later read Article V to further limit Congress's role in proposing amendments. In *Congressional Pay Amendment,* we rejected the proposition that *Coleman* had recognized an exclusive congressional authority to determine when a constitutional amendment had been validly ratified. *See* 16 Op. O.L.C. at 101–02. In a footnote, our 1992 opinion questioned the 1977 opinion's interpretation of *Coleman*, although we suggested that the extension of the ERA ratification deadline might be viewed as the "'reproposal' of a constitutional amendment" (a purely congressional action) rather than "the certification of a ratified amendment" (an action in which Article V gives Congress no role). *Id.* at 102 n.24. At the same time, we opined that, "[t]o the extent that our earlier opinions suggest that Congress alone must make the determination of the adoption of a constitutional amendment, we reject them today." *Id.* For the reasons discussed above, we also take a narrower view of *Coleman* than the one advanced in our 1977 opinion, and we do not believe that the

decision supports the authority of Congress to revise a deadline included in an amendment previously proposed to the States.

Yet even under the reasoning of *Constitutionality of ERA Extension*, there was a distinction between congressional action to extend a pending ratification deadline and action to revive it after the fact. That opinion concluded that, under *Coleman*, Congress might reconsider whether a seven-year deadline was a "reasonable time" for ratification, but the opinion simultaneously suggested that any such authority could not survive the deadline's expiration. As we observed, "[c]ertainly if a time limit had expired before an intervening Congress had taken action to extend that limit, a strong argument could be made that the only constitutional means of reviving a proposed amendment would be to propose the amendment anew by two-thirds vote of each House and thereby begin the ratification process anew." *Constitutionality of ERA Extension* at 5–6. The Acting Solicitor General effectively took the same view in Supreme Court litigation about the extension of the ERA Resolution, defending the extension until the deadline expired, but then acknowledging that the effort to ratify the ERA had come to an end. *See* Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3–4, *Nat'l Org. for Women* ("[T]he amendment has failed of adoption . . . . Even if all of the ratifications remain valid, the rescissions are disregarded, and Congress is conceded the power to extend the ratification period as it did here, only 35 of the necessary 38 states can be regarded as having ratified the Amendment.").

The proponents of the 1978 ERA extension also relied upon Congress's general authority to extend statutes of limitations. As Justice Ginsburg explained in 1979, "[i]n form and function, the seven-year provision is a statute of limitations. Generally, statutes of limitations may be extended should the legislature determine that its initial estimate was inaccurate." Ginsburg, 57 Tex. L. Rev. at 927 n.43; *see also House Extension Hearings* at 129 (testimony of Prof. Ruth Bader Ginsburg) ("It is the general rule that extensions [of] statutes of limitation may be directed by the legislature. . . . If the objective was simply to exclude [stale] claims, an extension of the limitation period for a reasonable time is well-accepted and fully comports with constitutional constraints.").[27] It is true that

---

[27] We again note that, several months ago, Justice Ginsburg publicly stated her view that the ERA "fell three States short of ratification" and the ratification process must begin anew: "I hope someday [the ERA] will be put back in the political hopper, *starting*

Congress may extend a limitations period, sometimes even after pending claims have expired. *See Chase Secs. Corp. v. Donaldson*, 325 U.S. 304 (1945); *Campbell v. Holt*, 115 U.S. 620 (1885); *see also Plaut v. Spend-thrift Farm, Inc.*, 514 U.S. 211, 228 (1995) ("[T]he length and indeed even the very existence of a statute of limitations upon a federal cause of action is entirely subject to congressional control."). But Congress changes the terms of a statute of limitations only by enacting a new law, and that change is adopted through the same constitutionally required procedures as the prior one. *See* U.S. Const. art. I, § 7. There is no constitutional shortcut that would permit revisions without adoption by both Houses and presentment to the President. By the same token, we do not believe that Congress may change the terms upon which an amendment has been proposed to the States except by following the same procedures that were required in connection with the earlier proposal, namely proposal by two-thirds majorities and a new round of consideration by the States.

Because Congress and the state legislatures are distinct actors in the constitutional amendment process, the 116th Congress may not revise the terms under which two-thirds of both Houses proposed the ERA Resolution and under which thirty-five state legislatures initially ratified it. Such an action by this Congress would seem tantamount to asking the 116th Congress to override a veto that President Carter had returned during the 92nd Congress, a power this Congress plainly does not have. *See Pocket Veto Case*, 279 U.S. 655, 684–85 (1929) ("[I]t was plainly the object of the [relevant] constitutional provision that there should be a timely return of the bill, which . . . should enable Congress *to proceed immediately with its reconsideration*[.]" (emphasis added)). Because the 1972 ERA Resolution has lapsed, the only constitutional way for Congress to revive the ERA, should it seek to do so, would be for two-thirds of both Houses of Congress to propose the amendment anew for consideration by the States.

## IV.

In view of our foregoing conclusions, it is unnecessary for us to consider whether the earlier ratifications of the ERA by five state legislatures were validly rescinded. *See supra* note 8 and accompanying text. The question of a State's authority to rescind its ratification, before an

---

*over again*, collecting the necessary number of States to ratify it." *See supra* note 1 and accompanying text (emphasis added).

amendment has been ratified by three-fourths of the States, is a significant one that has not been resolved. *See* Ginsburg, 57 Tex. L. Rev. at 920 (describing the doctrine of rescission as "the most debatable issue" concerning the ERA's legal status shortly after the 1978 extension). In *Constitutionality of ERA Extension*, we concluded that the Constitution does not permit rescissions, even if Congress had changed the ratification deadline after the State had voted upon the amendment. *See id.* at 28–49; *see also Power of a State Legislature to Rescind its Ratification of a Constitutional Amendment*, 1 Op. O.L.C. 13, 15 (1977).

The district court in *Idaho v. Freeman* disagreed, however, reasoning that *Dillon*'s interpretation of Article V requires a contemporaneous consensus of the people of the United States, and therefore implies that a state legislature, as the representative of one portion of the people, remains free to change its position until three-fourths of the States have agreed in common to support ratification. *See* 529 F. Supp. at 1146–50. The Supreme Court did not reach the question before the extended deadline expired. Although we have disagreed in this opinion with some of the conclusions in the 1977 opinion, we believe that the expiration of the ERA Resolution makes it unnecessary for us to revisit this question. Regardless of the continuing validity of the five States' ratifications, three-fourths of the States did not ratify the amendment before the deadline that Congress set for the ERA Resolution, and therefore, the 1972 version of the ERA has failed of adoption.

## V.

For the reasons set forth above, we conclude that the ERA Resolution has expired and is no longer pending before the States. Even if one or more state legislatures were to ratify the 1972 proposal, that action would not complete the ratification of the amendment, and the ERA's adoption could not be certified under 1 U.S.C. § 106b. In addition, we conclude that when Congress uses a proposing clause to impose a deadline on the States' ratification of a proposed constitutional amendment, that deadline is binding and Congress may not revive the proposal after the deadline's expiration. Accordingly, should Congress now "deem [the ERA] necessary," U.S. Const. art. V, the only constitutional path for amendment would be for two-thirds of both Houses (or a convention sought by two-thirds of the state legislatures) to propose the amendment once more and

restart the ratification process among the States, consistent with Article V of the Constitution.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*